IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  03-cv-01181-LTB-BNB

ROBERT PAUL THORPE, and
MARIA ELIZABETH THORPE,

      Plaintiffs,

v.

STANLEY ANCELL,
JULIA STOGSDILL,
ROBERT RUSSELL,
CRAIG TYER,
LISSAH NORCROSS,
DAVID WOOLEY, a/k/a JESSE DAVID WOOLEY,
RIECKE CLAUSSEN,
JOHN C. JACKSON,
ROBERT M. CULVER,
MARTYN CURRIE, and
WILLIAM "BILL" GARDNER,

      Defendants.

---

## ORDER

---

In response to the defendants' motions for summary judgment, the plaintiffs, Robert and Maria Thorpe, attempt to create genuine issues of material fact by obscuring the record with incomprehensible assertions and shocking the senses with alarming and fanciful allegations.  This practice avails nothing under Rule 56 and summary judgment shall enter for the defendants; I GRANT the motions.  The motions are exhaustively briefed and oral argument would not materially aid their resolution.

## I. Allegations

The Thorpes in their Amended Complaint make a series of striking allegations.  Among other things, the Thorpes allege that the defendants, members of the City of Grand Junction Police Department ("GJPD") and Mesa County Sheriff's Department ("MCSD"): employed a known prostitute to seduce their 16-year old son; conspired to persecute them with unfounded criminal charges; ignored, concealed, and destroyed exculpatory evidence; solicited perjurious testimony against them; falsified inculpatory reports; altered evidence; made false reports to a state regulatory agency; and met together to concoct their alleged, oppressive machinations. When ruling some months ago on motions for dismissal pursuant to Rule 12, I took these allegations as true.

Notably, granting the Thorpes every possible evidentiary benefit and drawing every conceivable inference in their favor, not a whit of their serious claims finds any support in the record before me on summary judgment.  I presume that, if any evidence existed upon which I might infer that the Thorpes' disturbing allegations have any merit, that evidence would appear among the hundreds of pages of documents and testimony, which the parties have submitted.  The Thorpes have neither moved to amend their Amended Complaint nor by any other mechanism withdrawn their allegations.  I wonder whether the Thorpes' counsel had any reason to believe at the time he filed the Amended Complaint that his allegations rested upon evidentiary support or were likely to do so after a reasonable opportunity for further investigation or discovery.  Fed. R. Civ. P. 11(b)(3).  Any initial abuses of Rule 11 would be extraordinarily significant in this case; the defendants are not alleged to have cheated at cribbage but rather to have violated the public trust by radically gross indiscretions and abuses of authority.

2

Still more troubling is that the Thorpes' counsel repeats several of these spurious assertions in his brief opposing the defendants' motions for summary judgement.  Among the claims in the brief that find no evidentiary support in the record are: that the defendants "coerced a false confession from" a witness, p. 8; that the prosecutor "had many concerns about the investigation of the Thorpes," p. 19; that an informant obtained inculpatory evidence by impersonating Mrs. Thorpe with the defendants' knowledge and assent, p. 23; and that a witness implicated one of the defendants in carrying on a sexual relationship with an informant, p. 23. Furthermore, the Thorpes' counsel in his brief attributes to defendants statements made by persons not parties to this case – "Detective Tyer had told Ms. Fish... that the Thorpes had called Child Services on her," p. 13 – and assertions that do not appear in the record at all – "Ms. Fish decided to do what Defendants wanted because she was told that the Thorpes had charged her with crimes involving the Patton money," p. 14.  Other misrepresentations and exaggerations emerge.

Because the defendants – Martyn Currie, Stanley Ancell, Julia Stogsdill, Robert Russell, John C. Jackson, Robert M. Culver, Riecke Claussen, David Wooley a/k/a Jesse David Wooley, Lissah Norcross, Craig Tyer, and William Gardner – deserve what little vindication a summary judgment order can provide, I set out the undisputed facts and discuss the legal implications of those facts below.

## II.  Facts

The proffered evidence reveals that the material facts are undisputed.

### A.    The defendants' evidence

### 1.    The Patton bank robbery

A December 28, 1998 bank robbery in Clifton, Colorado initiated the saga described below.  Lissah Norcross, Craig Tyer, and other deputies of the MCSD launched an investigation, which resulted in the December 30, 1998 arrest of Gary Patton, who is not a party to this case.  Mr. Patton was eventually convicted.

After Mr. Patton's arrest, MCSD deputies discovered that Mr. Patton had failed to account for some of the proceeds of the crime.  Deputy Tyer's attention turned to Heather Fish, an employee of the Thorpes' bail bonding business, A-1 Bailbonds ("A-1").  Ms. Fish had provided the bond for Mr. Patton's release and had escorted him from jail.  Karen Kemp, a colleague of Ms. Fish, and Karen's husband Jack contacted Deputy Tyer and informed him that Mr. Patton had paid his bond premium to A-1 using $1600 in proceeds from the robbery.  Deputy Tyer confronted Ms. Fish and Mrs. Thorpe with this allegation, which they denied.  Deputy Tyer then interviewed the Kemps, who persisted in their account: Mr. Patton had secreted the money in his shoe and had relinquished the funds to Ms. Fish at A-1's office.  Ms. Fish had accepted the funds and contrived with Mrs. Thorpe to conceal the transaction from Deputy Tyer.

Deputy Tyer handed the ensuing investigation over to Detectives Stanley Ancell and Robert Culver of the GJPD.  Thereafter, deputies of the MCSD had no involvement in the investigation of the Thorpes and Ms. Fish.  On November 29, 1999, Mr. Patton on his own initiative informed Deputies Tyer and Norcross that he had used money stolen from the bank, concealed in his shoe, to make good his bond premium to Ms. Fish.  The deputies provided a transcript of this admission to Detectives Ancell and Culver.

4

### 2.     The affidavits

The GJPD investigation continued during the ensuing months, as investigation of the bond premium payment led to evidence of other alleged wrongdoings by the Thorpes.  On June 8, 2000, Detective Ancell in culmination submitted to a state court affidavits in support of applications for warrants authorizing the arrests of the Thorpes and searches of their residence and business premises.  The affidavits, each between ten and thirteen single-spaced pages in length, describe the results of the investigation, findings both inculpating and exculpating the Thorpes in various alleged offenses.  I summarize the contents.

On October 27, 1999, the detectives interviewed Ms. Fish and two other employees of A-1, Joe and Sherri Green.  Ms. Fish admitted having received $1600 from Mr. Patton when she bailed him out of jail.  Upon the admonition of Mrs. Thorpe, she had told Deputy Tyer that Mr. Patton had given her no money, a prevarication.  Also at Mrs. Thorpe's urging, Ms. Fish had delivered the money to the Thorpes' attorney, Steve Laiche.  This was the only occasion on which Ms. Fish had ever delivered money to Mr. Laiche.  Deputy Tyer's reports, provided to the detectives and summarized in the affidavits, confirmed that Ms. Fish had denied receiving any money from Mr. Patton and contained the statements of the Kemps to the contrary.

During the October 27 interview, the informants described other alleged Thorpe crimes.  Mrs. Green and Ms. Fish told the officers that Mrs. Thorpe had on occasion forged signatures on significant documents, tracing inscriptions with common devices, such as child tracing kits and panes of glass.  The Greens related that they had traveled with Mrs. Thorpe to the home of Dorothy Ausmus, whose son had absconded while free on a bond issued by A-1.  The Greens asserted that Mrs. Thorpe burglarized the Ausmus house and swiped bank records and checks,

which she anticipated might reveal support by Ms. Ausmus of her fugitive son.  Mrs. Thorpe

allegedly copied the documents and returned some, but not all, of the originals to the Ausmus

house.  Mr. Green provided to the detectives the incriminating photocopies.  The detectives later

corroborated this account with Ms. Ausmus' teen-aged granddaughter, who had been home alone

at the time of Mrs. Thorpe's entry; the granddaughter discovered Mrs. Thorpe emerging from the

basement of the house and admitted her to the kitchen, thus to the upper rooms, after Mrs.

Thorpe threatened to call the police.

On November 18, 1999, Ms. Fish, carrying a recording device by agreement with the

detectives, confronted the Thorpes concerning the Patton premium.  The Thorpes during the

conversation confessed their knowledge that Ms. Fish had received the money and admitted that

they had instructed her to take the money to Mr. Laiche.  Mrs. Thorpe further admonished Ms.

Fish to keep receipt of the money a secret, saying, "You don't know anything at all," and, "If it's

not documented as far as a receipt or anything in here, it never happened.  Okay?"  The Thorpes

called Mr. Laiche, who acknowledged, while broadcast over the speaker telephone, that he had

received the money from Ms. Fish.

Subsequent attempts to record admissions from the Thorpes and their attorney proved

unsuccessful.  On May 8, 2000, Ms. Fish telephoned Mr. Laiche, who neither admitted nor denied

having received the money.  On May 10, 2000, Ms. Fish called Mrs. Thorpe, who denied having

accepted the money.  On May 12, 2000, Ms. Fish confronted Mr. Laiche, who refused to speak

with her.

In December, 2000, Ms. Fish provided to the detectives A-1 documents that appeared to

bear her signature.  She stated that she had not signed these documents and suspected that Mrs.

Thorpe had forged her signature. The Greens provided photocopies of documents that they and

Ms. Fish had allegedly watched Mrs. Thorpe counterfeit. On May 9, 2000, John Antonopoulis, a

client of A-1, informed the detectives that marks purporting to be his signatures on documents

from A-1's files were not genuine.

On April 4, 2000, Mr. Green called Detective Ancell to report that Mr. Thorpe had stolen

a 1965 Ford Falcon from a friend named George Schryver. A computer search revealed that a

warrant for Mr. Schryver's arrest was active. On May 1, 2000, after Mr. Schryver had turned

himself into custody, the detectives interviewed him. Mr. Schryver stated that A-1 had bonded

his release twice after arrests in 1997. One of the charges was dismissed, the other was disposed

on March 9, 1998 and both bonds were discharged. Thereafter, he and Mr. Thorpe opened an

automobile body shop together. When, in July, 1999, Mr. Schryver was removed to California to

face revocation of probation there, Mr. Thorpe evicted Mr. Schryver's girlfriend from Mr.

Schryver's house (Mr. Thorpe's financial relationship to the property is not revealed) and

confiscated Mr. Schryver's personal belongings, including the car. Mr. Schryver asserted that he

had purchased the vehicle in June, 1998, after exoneration of both of his bonds, and thus

established that he had never encumbered the car as collateral to A-1. He claimed that Mr.

Thorpe was storing the vehicle at the Thorpes' residence.

The detectives through interviews, public records, and a duplicate bill of sale in Mr.

Green's possession confirmed numerous details of Mr. Schryver's account, including the

circumstances of his June, 1998 purchase of the car, the vehicle identification number, and that

Mr. Schryver was the sole titled and registered owner. The detectives confirmed through

surveillance that a car matching the description of Mr. Schryver's automobile was parked in a

field adjacent to the Thorpes' house.  They confirmed that Mr. Schryver's bonds, issued by A-1, had been exonerated on the dates Mr. Schryver identified.  They confirmed through Mr. Schryver's California probation officer the circumstances of Mr. Schryver's July 30, 1999 extradition to California and that Mr. Schryver had been released on August 27, 1999.  They confirmed with Mr. Schryver's girlfriend, Carolyn Cliffton, that Mr. Thorpe had taken the car under the pretense that Mr. Schryver had placed it as collateral against an A-1 bond.  A receipt obtained from a local towing company confirmed that one of the company's trucks had towed the car to A-1's office.

On May 17, 2000, in cooperation with and under monitoring by the detectives, Mr. Schryver called Mr. Thorpe about the car.  Mr. Thorpe first asserted that Mr. Schryver had put the car up as collateral on a bond.  When Mr. Schryver challenged this tale, Mr. Thorpe abandoned it, instead insisting that Mr. Schryver owed him money for tools that Mr. Schryver had removed from the auto body business.  Mr. Schryver denied this account.  Mr. Thorpe instructed him to call the police.

The detectives next enlisted a GJPD officer, not a party to this case, to call Mr. Thorpe and inform him that Mr. Schryver had reported him for automobile theft.  Mr. Thorpe insisted that the car was collateral for a bond.  He then gave the telephone to Mrs. Thorpe, who admitted that the car was not collateral, that Mr. Thorpe had taken it as repayment of money that Mr. Schryver owed to the Thorpes, and that it was parked at their house.  She insisted that Mr. Schryver's girlfriend had delivered the car to them at Mr. Schryver's request.

On March 28, 2000, Beth Ham, an investigator for the Colorado Division of Insurance ("CDI"), called Detective Ancell to report that the Thorpes had sent their resumes to her,

intending to secure licenses to instruct a class for bondsmen. Subsequent investigation indicated that the Thorpes had exaggerated or fabricated facets of their resumes. For example, Mr. Thorpe's resume stated that he had served the Drug Enforcement Agency ("DEA") in San Diego as a contract agent between 1991 and 1994. A call to the DEA in San Diego revealed that Mr. Thorpe had been a paid informant between 1991 and 1993. Two police departments that Mrs. Thorpe claimed to have served as an officer had no record of her employment. A third had never employed Mrs. Thorpe in the position she claimed to have occupied, "Assistant Chief of Police."

At approximately this time, Joe Salazar of the CDI commenced an investigation of the Thorpes for suspected theft of bond collateral from William Stanford. Mr. Stanford had obtained from A-1 a bond for his son. After exoneration of the bond, A-1 did not repay the $25,000 collateral. CDI's investigation revealed that the Thorpes had deposited the collateral into an account from which they had subsequently made withdrawals, with the result that they no longer possessed the collateral when Mr. Stanford demanded repayment. Instead, after some time the Thorpes borrowed $25,000 from Ranger Insurance, which compensated Mr. Stanford. An agent of Ranger Insurance notified the GJPD of the incident. Detectives Ancell and Culver then contacted Mr. Salazar, who relayed to them the history recited above. Mr. Green, who had worked for the Thorpes during this incident, confirmed for the detectives the lack of funds in the account – $200 remained – and Mrs. Stanford confirmed A-1's failure to repay.

On April 25, 2000, Mrs. Green informed Detective Culver that Mrs. Thorpe had followed the Greens to a Wal-Mart store. The Greens emerged from the store to find Mrs. Thorpe standing next to their vehicle making sweeping motions in the direction of a passenger-side door. When the Greens attained their automobile, they discovered two fresh gouges on the door; the

door had been "keyed."  Detective Culver obtained from the store a security videotape, which

confirmed that Mrs. Thorpe's vehicle had followed the Green's vehicle into the parking lot that

day.  On May 12, 2000, Detective Culver telephone Mrs. Thorpe, who denied having vandalized

the Green's automobile.  She then volunteered that her vehicle had been "keyed" on several

occasions.  The detectives took note of this particular phraseology; Detective Culver had not

stated that the Green's vehicle was"keyed."

With reference to these findings, Detective Ancell requested warrants for arrest of the

Thorpes on charges against Mrs. Thorpe for burglary and criminal mischief and against both of

the Thorpes for motor vehicle theft, theft of more than $15,000, attempt to influence a public

servant, theft by receiving, conspiracy to commit  theft of more than $15,000, conspiracy to

commit theft by receiving, conspiracy to attempt to influence a public servant, and conspiracy to

commit motor vehicle theft.  After review, a judge of the State of Colorado approved the

application and issued the warrants.  The Thorpes were arrested and released on bond the same

day.

### 3.   The prosecution

The GJPD referred the prosecution of the Thorpes' case to David Waite, a deputy district

attorney in Moffat County who was assigned Special Prosecutor for the case in October, 2000.

In January, 2001, having had insufficient opportunity to investigate the charges and seeing a trial

date looming, Mr. Waite dismissed the case without prejudice.  In June, 2001, he re-filed.

Thereafter, the court severed the disparate charges, ordering that they be tried separately.  As a

result, Mr. Waite decided to dismiss the charges with prejudice, which he did in June, 2002.

By affidavit, Mr. Waite avers that no member of the GJPD "attempted to exert improper

pressure or inappropriately influence the filing of charges or the overall prosecution against" the

Thorpes. He has no reason to believe that any member of the GJPD made any false statements.

His decision to dismiss the charges was not based upon any doubt that probable cause existed.

Indeed, when he dismissed the charges for the second, and final, time in June, 2000, he "still held

the belief that probable cause existed for the arrests of" the Thorpes and to support "each of the

charges filed against them."

### B.   The plaintiffs' evidence

In deposition, Detective Culver testified that no prosecutor has ever denounced one of his

arrests for lack of probable cause. He had been frustrated with Mr. Waite's decisions to dismiss

charges against the Thorpes and against alleged offenders implicated in other GJPD

investigations; he had the impression that Mr. Waite "didn't seem to want to zealously prosecute

things." Mr. Waite had offered in explanation that the charges had been severed and that he did

not intend to prosecute seven distinct trials against the Thorpes.

Detective Culver conceded that the June 4, 2001 complaint charging Mr. Thorpe with five

criminal offenses, including burglary, bore his signature and that investigation into the burglary at

the Ausmus residence had not implicated Mr. Thorpe. He pointed out that the government had

dismissed the burglary charge as soon as it recognized the error. He attributed the mistake to

inadvertence; after failing for some months to communicate with the detectives about the case,

Mr. Waite produced the complaint, which Detective Culver signed without diligent review.

Ms. Fish was not registered with GJPD as an informant; Detective Culver considered her a

citizen informant. Neither Detective Culver nor anyone else involved with the investigation

offered Ms. Fish anything in exchange for her testimony and cooperation. He was aware that the

Thorpes had previously accused Ms. Fish of theft, but had left the probe of those allegations to Detective Julia Stogsdill, who was commissioned with that investigation.  GJPD kept the two investigations separate in order to avoid exercising undue bias in either matter.  He at no time judged Ms. Fish's or Mr. Patton's credibility to be greater than that of the Thorpes.  From the inception of the investigation, Detective Culver designated Ms. Fish as a suspect in the alleged reception of stolen money from Mr. Patton and he never recommended to the prosecutor that Ms. Fish not be prosecuted.

Detective Ancell testified that any charges against Mr. Thorpe for burglary resulted from errors of the District Attorney's office and pointed out that his June 8, 2000 affidavit contained nothing implicating Mr. Thorpe in the Ausmus burglary.  He was unable to locate a videotape of interviews with Ms. Fish and Mr. Green; he had booked the recording into evidence but was unable to locate it prior to his deposition.  His practice is to preserve notes of his investigation until he has completed reports based upon those note, then to destroy the notes.

I note that Detectives Culver and Ancell during their depositions resisted several attempts by the Thorpes' counsel to mischaracterize their testimony, the contents of relevant documents, and the testimony of other witnesses.  In addition, the Thorpes' attorney suggested to Detective Culver that Ms. Fish was a "known prostitute," about which the detective disclaimed any knowledge.  The Thorpes' attorney asserted to Detective Culver, without any apparent grounds, that Detective Ancell and other GJPD officers had been sexually involved with Ms. Fish, an assertion that Detective Ancell in his prior deposition had denied, and asked Detective Culver if he had been intimate with the woman.  References to these mischaracterizations and unsubstantiated insinuations have found their way into the Thorpes' brief as assertions of fact.

The Thorpes have submitted purported statements from Gilbert Stone, an investigator for the Mesa County District Attorney. Mr. Stone is not a percipient witness and the Thorpes have provided the foundation on which his statements might be taken as expert testimony. It is not at all clear on what basis his testimony might be admissible. Nevertheless, I summarize his statements for the purpose of showing that, even if I was to admit his putative testimony, his assertions create no material, disputed issue for trial. I also will presume for the purposes of this motion that Mr. Stone is the author of an unsigned, ten-page memorandum from "Gil" to "Pete" dated August 10, 2000. The document is not authenticated and its origins are not disclosed.

The memorandum discusses ostensible weaknesses in the evidence against the Thorpes and purported shortcomings of Detective Ancell's June 8, 2000 affidavits. By means of cryptic references, incomplete sentences, use of the passive voice, rhetorical questions, and unexplained speculation, the document resists comprehension. What little can be gleaned from it suggests that Mr. Stone thought little of the credibility of Detective Ancell's sources. He notes that the Thorpes in February, 2000 attempted to file criminal charges against Ms. Fish, that the District Attorney declined to prosecute the case, and opines without explanation that the Thorpes' allegations were "possibly" legitimate. He remarks that the Thorpes by their criminal allegations against Ms. Fish succeeded in making the criminal charges filed against them "appear prejudiced, malicious and unjust." He finds "no proof" in Detective Ancell's affidavits that the money that Ms. Fish received from Mr. Patton was contraband. The memorandum contains a detailed account of Mr. Patton's admissions on this point, but Mr. Stone opines that Mr. Patton's admissions are unreliable. Mr. Stone conjectures, based upon no apparent evidence, that Ms. Fish stole the $1600 from the Thorpes. He suggests lines of investigation that the GJPD might have

13

pursued but left unexplored.  He casts aspersions upon the credibility of the MCSD, which was at the time of the GJPD's investigation the defendant in a lawsuit that the Thorpes had initiated.

Mr. Stone faults the GJPD for treating Mr. Thorpe's confiscation of Mr. Schryver's automobile as a criminal matter, rather than a civil dispute.  He considers insignificant the distinction between a contract agent for the DEA and a paid informant for the DEA.  He sees no deceit in the other embellishments contained within the Thorpes' resumes.  He concedes that, though Mr. and Mrs. Green "are obvious adversaries of the Thorpes," their account of Mrs. Thorpes' alleged vandalism of their vehicle, along with the circumstantial evidence, "may convince a jury of Maria Thorpe's guilt."  Finally, Mr. Stone opines that the case against the Thorpes was "disturbing."  The document contains no indication that any of the defendants violated any laws.  Nor does it indicate in any manner that Detective Ancell made any misrepresentations in or omitted any exculpatory information from his affidavits.  Mr. Stone concludes merely, "There are many unanswered questions."

In deposition, Mr. Stone opined that the GJPD had insufficient evidence to convict the Thorpes of all but the vandalism charge.  He declined to speculate why charges were filed.  The portion of his deposition transcript that the Thorpes have provided is long on opinion and utterly lacking in factual contributions.

Depositions of Lieutenant John Jackson and Sargent Robert Russell revealed that these men supervised Detectives Ancell and Culver.  Sargent Russell also assisted in the search of the Thorpes' residence.  He confirmed that a Mesa County District Attorney, Brian Flynn, had reviewed Detective Ancell's June 8, 2000 affidavits before submission to the court.  He was satisfied with the adequacy of the detectives' investigation.  Lieutenant Jackson "felt as though

14

the work that was done certainly met the standard of an investigation... ." He concluded that the investigation had been thorough and prosecution warranted.

In her deposition, Detective Stogsdill testified that she had during her investigation into the Thorpes' charges against Ms. Fish caught the Thorpes in a lie. The Thorpes submitted to Detective Stogsdill a check that Ms. Fish had written for the benefit of property that the Thorpes owned. They denied owning the property and claimed that the check, with others written for Ms. Fish's benefit, constituted evidence that Ms. Fish was embezzling funds from them. Detective Stogsdill determined from public records that the Thorpes had, in fact, owned the subject property at the time Ms. Fish wrote the check. This prevarication did not cause Detective Stogsdill to discount the remainder of the Thorpes' assertions, but did make Ms. Fish's defense more credible; Ms. Fish claimed that the Thorpes had authorized her to sign the checks.

Detective Stogsdill testified that she interviewed Ms. Fish concerning the Thorpes' allegations and that Ms. Fish made several admissions against interest. On balance, Detective Stogsdill found Ms. Fish credible. On May 3, 2000, Detective Stogsdill wrote to the prosecutor, Wiley Christopher, recommending that no charges be filed on the Thorpes' allegations. Though she insisted, "I don't believe Heather Fish is an innocent victim in this at all," she pointed out that the Thorpes' prevarication amounted to a false report. She concluded that Ms. Fish and the Thorpes had experienced a "falling out" and that each side was "trying to muddy the water."

Mr. Christopher recalls by affidavit that he decided not to prosecute Ms. Fish; probable cause existed, but he doubted the likelihood of attaining a conviction. He then telephoned the officer in charge of the investigation (Detective Stogsdill), who affirmed his decision not to prosecute and informed him of the pending investigation into the Thorpes' various alleged crimes.

15

The Thorpes have provided a signed written statement of Mr. Green, who asserts that Ms. Fish encouraged Mr. Stanford to pursue civil and administrative recourse against the Thorpes and concealed from the Thorpes Mr. Stanford's numerous requests for repayment. However, nothing in the record indicates that any of the defendants knew of this purported behavior. Mr. Green testified in deposition that Ms. Fish had asked him to conceal from the Thorpes that the Stanfords were seeking repayment of their bond premium. He went against her wishes, informed Mr. Thorpe of Mr. Stanford's demands, and delivered to Mr. Thorpe a written demand from Mr. Stanford.

Mr. Green also resisted in his deposition attempts by the Thorpes' counsel to implicate GJPD and MCSD officers in having illicit relationships with Ms. Fish. Throughout repeated questioning on the topic, Mr. Green disclaimed any knowledge that such conduct had occurred.

Ms. Fish in deposition testified that the GJPD knew of the Thorpes allegations against her before Detectives Ancell and Culver began utilizing her as a source in the investigation of the Thorpes. She denied having converted any bonding collateral to her own possession or use. The Thorpes accused her of stealing Mr. Patton's premium when in fact she had delivered the money to Mr. Laiche. Detective Craig Tyer of the MCSD initiated the investigation into the circumstances of Mr. Patton's premium before relinquishing the project to Detectives Ancell and Culver. Ms. Fish originally met with Detective Tyer to share what she knew about the incident with Mr. Patton. Her motivation for cooperating with law enforcement was to restore her reputation. She understood the subjects of the investigation to be her and Mr. and Mrs. Thorpe. None of the investigating officers offered Ms. Fish anything in exchange for her cooperation.

Ms. Fish testified that, at the time she accepted Mr. Patton's premium bond, she was not

16

aware that the money was contraband.  However, she recalled that Mr. Patton later suggested to

Mr. Thorpe that the money consisted of proceeds from the bank robbery.  During the ensuing

investigation into the source of the money, Ms. Fish informed Detectives Ancell and Culver about

the Thorpes' other alleged crimes, including forgery.  When asked whether she could demonstrate

her accusations with evidence, Ms. Fish obtained for the officers copies of files from the A-1

office.  The detectives then submitted the samples to forensic handwriting analysis.

     Ms. Fish agreed to wear the wire while confronting the Thorpes because she wanted to

prove that she had passed Mr. Patton's premium to Mr. Laiche.  Because of the Thorpes'

accusations, she was at the time in fear of prosecution, but thought that the investigating officers

were "just trying to find out what really happened."

     For reasons that are not apparent from the record, the Thorpes' counsel asked Ms. Fish a

series of questions concerning the Thorpes' son, David.

> Q: This may be the third time through this set of questions, but these are different.  Did
> you befriend David Thorpe to get back at the Thorpes?
> A: No.
> Q: Did you have any physical relationship with David Thorpe?
> A: No.
> Q: Did you have any sexual relationship with David Thorpe?
> A: No.

I can discern no strategic justification for this line of questioning, other than belligerence.

Nothing in the record suggests that these questions rested upon any foundation other than fancy.

### C.   Other proffers

By affidavit Sonya Doyal, an agent of a bonding service, states that she was with Mrs. Thorpe during the entry into the Ausmus residence.  She avers that no one from the GJPD contacted her during the investigation of the alleged Ausmus burglary to elicit her account of the events.  She states that she "attempted to contact" the GJPD without success.

An unauthenticated document appears in the Thorpes' submissions bearing the mark of the United States Department of Justice and addressed to "State of Colorado."  No author is identified, the document is not dated and bears no signature.  As I cannot discern from the record what the document is, I need not consider it.  Fed. R. Civ. P. 56(e).  In any event, its contents provide no support for the Thorpes' allegations.  It purports to assert that Mr. Thorpe was a paid informant for the Drug Enforcement Administration between May, 1992 and July, 1993, just as Detective Ancell reported in his June 8, 2000 affidavit.

The Thorpes proffer a document purporting to be a letter from the prosecutor who declined to press charges against Ms. Fish.  As the defendants point out, the document is not authenticated.  Regardless, the letter adds nothing of substance to the record and provides no indication that the Thorpes' allegations here have any merit.

The Thorpes provide a document, unauthenticated, purporting to be Ms. Fish's criminal history as of January 26, 2001.  They also provide a document purporting to be a pretrial report for Mr. Green, containing a criminal history consisting of a 1988 burglary charge and a 1994 disorderly conduct charge.

The Thorpes proffer a document titled, "Affidavit of Mary Strohm."  The document is neither signed nor notarized.  It is not dated, and its authenticity is not in any way demonstrated.

18

Indeed, a signature line appearing on the document is blank.

Correspondence between Mr. Waite and the GJPD concerning the Thorpe investigation explicates litigation and plea negotiation strategy, intended subjects of further investigation, and the GJPD's frustrated attempts to communicate with Mr. Waite about the case before Mr. Waite dismissed charges for the second, and final, time. Nothing in these missives has any bearing upon the Thorpes' allegations.

A document titled, "Joseph Green, Plaintiff, complaint against Heather Fish, Defendant Concerning wrongful dissolution of partnership," dated December 18, 2000, appears to describe a dispute between Mr. Green and Ms. Fish over control of a business referred to as "Ablaze Bail Bonds." As with several other documents in the record, I am at a loss to discern the relevance of this item.

### III. Discussion

Remaining for disposition are claims against each of the defendants for purported violations of 42 U.S.C. § 1983. No evidence appears that any of the members of the MCSD – Riecke Claussen, David Wooley a/k/a Jesse David Wooley, Lissah Norcross, Craig Tyer, and William Gardner – participated in the investigation of the Thorpes. Thus, judgment must enter for all of them. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Similarly, no officers of the GJPD other than Detectives Ancell and Culver were involved in the allegedly offending conduct. Nothing in the record implicates Lieutenant Jackson or Sargent Russell. Section 1983 does not contain a concept of strict supervisor liability. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Thus, a plaintiff must show not mere supervision but rather "a deliberate, intentional act by the supervisor to violate constitutional rights." *Id*. at 995. No such evidence appears here.

Because Detectives Ancell and Culver enjoy qualified immunity to perform the duties of their job, the Thorpes must prove that the detectives trenched upon a clearly established constitutional or statutory right and that a reasonable person in the detectives' positions would have known their conduct violated that right. *Beard v. City of Northglenn*, 24 F.3d 110, 114 (10th Cir. 1994). The Thorpes have failed to produce any evidence raising a genuine issue of material fact.

First, the affidavits on their face demonstrate probable cause for the arrests of the Thorpes and the searches of their residence and business premises. *Beard*, 24 F.3d at 114. Second, the Thorpes have produced no evidence that the detectives included in the affidavits false information or omitted material information either knowingly or with reckless disregard for truthfulness. *Id.*; *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000). Though the Thorpes have identified some subjects that the detectives might have probed with greater vigor – the criminal histories of Mr. Green and Ms. Fish; the financial relationship between Mr. Schryver and Mr. Thorpe – they have made no showing that any omissions were intentionally or recklessly made. Thus, whatever doubts the Thorpes have cast upon the thoroughness of the detectives' investigation do not give rise to claims under Section 1983. *Beard*, 24 F.3d at 114.

Third, the Thorpes have produced no evidence to suggest that their arrests were unlawful. Fourth, no evidence of malicious prosecution appears. Mr. Waite attested to his own, uncontested conviction that probable cause existed and exists for the charges that he twice brought against the Thorpes. My own review of the affidavits convinces me that, as a matter of law, probable cause was established. *J. S. Dillon & Sons Stores Co. v. Carrington*, 455 P.2d 201,

204 (Colo. 1969).  Nothing in the record suggests that the defendants had any motive other than bringing putative perpetrators to justice.  *Montgomery Ward & Co. v. Pherson*, 272 P.2d 643, 646 (Colo. 1954).  Where, as here, probable cause is demonstrated and no evidence of malice exists, summary judgment must enter for the defendants.  *Bill Dreiling Motor Co. v. Herlein*, 543 P.2d 1283, 1286 (Colo. Ct. App. 1975); *Wigger v. McKee*, 809 P.2d 999, 1007 (Colo. Ct. App. 1990), *cert. denied*, (1991).

Finally, nothing in the record raises a genuine issue whether the detectives conducted illegal searches of the Thorpes' residence and business.  The Thorpes do not dispute that the detectives applied for and received warrants to conduct the searches on June 8 and 23, 2000.  Nor does it appear from the record that the detectives exceeded the scope of their authority.

The Thorpes have produced a handwritten statement by Barry Trammell, the Manager of White Hall, LLC.  In the document, Mr. Trammell asserts that in June of 2000 he admitted three police detectives into "room # 107" and that, upon the request of the detectives, he opened the door to "room # 105" before leaving the premises.  The document does not identify the premises to which Mr. Trammell refers.  I presume that the plaintiffs would have me infer from this statement that Detectives Culver and Ancell exceeded the scope of their June, 2000 search warrant for the Thorpes' business premises.  However, all of the evidence before me indicates that the detectives searched the Thorpes' business premises, which they were authorized to do.  I cannot determine the extent or curtilage of the plaintiffs' business premises; the plaintiffs produce no evidence from which I might determine that "600 White Avenue, Suite 107," which the detectives had authority to search, was exclusive of "room # 105," wherever that room might have been situated.  I cannot tell what "room # 105" was or whether the detectives were

prohibited from entering that room.  Most significantly, no evidence indicates that the detectives

entered that room.

## IV.  Comments upon the conduct of the plaintiffs' counsel

Rule 11 of the Federal Rules of Civil Procedure provides, *inter alia*,

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

The Rule provides me with authority to sanction an attorney for violations, either upon motion or

*sua sponte* after the party to be sanctioned has had notice.

Furthermore, Congress has provided,

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  In addition, 42 U.S.C. § 1988(b) provides that the prevailing party in a

Section 1983 action may recover his reasonable attorney fees where the suit is vexatious,

frivolous, or brought to harass or embarrass the defendant.

An officer of the court occupies a privileged office with the capacity to visit significant adverse consequences upon those against whom he exercises his authority. Thus, attorneys must refrain from making allegations for which they can find no evidentiary support. Fed. R. Civ. P. 11(b)(3); *Laurino v. Tate*, 220 F.3d 1213, 1218 (10th Cir. 2000).

Mr. Silva, the plaintiffs' attorney, signed and filed an Amended Complaint containing fantastic allegations. Whatever the state of Mr. Silva's knowledge at the time of filing, discovery in this case demonstrated that the allegations were fanciful. For example, the Amended Complaint alleges that the defendants hired a prostitute to seduce the Thorpes' son, causing the son's eventual suicide. No evidence of that incident appears anywhere in the record. Mr. Silva charged the defendants with fabricating inculpatory evidence. The record demonstrates that no such thing ever occurred. He claimed that the defendants intentionally destroyed exculpatory evidence. The defendants misplaced one piece of evidence – the video cassette of the interview with Mr. and Mrs. Green – among an investigative file consisting, by Mr. Silva's own account, of 1432 pages of documents. Nothing in the record indicates that the loss was anything more than negligent. Nor does anything suggest that the tape contained any evidence exculpatory to the Thorpes or that Mr. Ancell misrepresented the substance of the recorded interview in his June 8, 2000 affidavit.

Despite the plethora of contrary evidence, Mr. Silva persisted in his dogmas throughout the discovery process, repeatedly misrepresenting evidence and testimony in his attempts to trick witnesses into conceding his claims. After none of the witnesses acquiesced in his artifices, Mr. Silva opposed the defendants' motions for summary judgment, further misrepresenting the facts of this case and persisting in his imaginative views, which lacked any evidentiary support. In support

23

of his opposition, Mr. Silva filed numerous unauthenticated documents.  Some proffers have no

discernable bearing on the relevant issues.  The memorandum authored by "Gil": contains no

identification or signature of the author; refers to documents that Mr. Silva has failed to produce

to opposing counsel; identifies none of the specialized knowledge, learning, and assumptions on

which its opinions are premised; and conceals much of the data on which it purportedly relies.

When the defendants moved to strike these stealthy proffers, Mr. Silva opposed those motions

and proffered additional documents, which were created in March, 2006, more than two months

*after* the defendants filed their motions for summary judgment and a month after Mr. Silva filed

his response.

   The litigation of these claims amounted to a months-long fishing expedition.  The

defendants, by standing on their procedural rights, presented Mr. Silva with numerous

opportunities, after the fruitlessness of the process had become clear, to abort his ill-advised

prosecution.  Mr. Silva instead persisted in his allegations, even as the probability of frivolity

increased to a certainty.

Accordingly, it is ORDERED that:

1) the defendants' motions for summary judgment are GRANTED;

2) judgment shall enter for all defendants on all claims with costs;

3) Mr. Silva shall, on or before **May 15, 2006**, show cause why I should not order him to pay the defendant's attorney fees pursuant to 28 U.S.C. § 1927; order his clients to pay the defendants' attorney fees pursuant to 42 U.S.C. § 1988(b); and further sanction him pursuant to Rule 11; and

4) the defendants shall respond on or before **May 29, 2006**.


Dated: May   1  , 2006, in Denver, Colorado.

BY THE COURT:


  s/Lewis T. Babcock          
Lewis T. Babcock, Chief Judge
